# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OKLAHOMA, NORTH CAROLINA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, AND WASHINGTON, *ex rel.* BRAD ASHTON, JASMINE LOPEZ, MICHELLE MCMAHON, and TERRY MCNAMARA,<br><br>Plaintiffs/Relators,<br><br>v.<br><br>LOGAN LABORATORIES LLC, and SURGERY PARTNERS, INC.,<br><br>Defendants. | Civ. No. _____<br><br><br>**FILED UNDER SEAL**<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

This is a *qui tam* action by the United States to recover treble damages and civil penalties on behalf of the United States Government (the "United States" or the "Government") and 27 States and the District of Columbia,[1] arising from false and/or fraudulent claims, made and/or caused to be made by Logan Laboratories LLC ("Logan"), and Surgery Partners, Inc. ("Surgery Partners" (collectively with Logan, "Defendants") in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* and similar state statutes.

---

[1] California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, Oklahoma, North Carolina, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington (collectively, the "Plaintiff-States").

*Qui tam* plaintiffs Brad Ashton, Jasmine Lopez, Michelle McMahon, and Terry McNamara ("Relators"), employees at Defendant Logan, through their attorneys at Lowey Dannenberg Cohen & Hart, P.C., and Greg Murphy, Attorney, on behalf of the United States of America and the Plaintiff-States, file this Complaint against Defendants and allege as follows:

## I.     INTRODUCTION

1.     Surgery Partners owns and provides services to pain management practices, small hospitals and surgery centers.  In 2013, Surgery Partners founded Logan, a toxicology laboratory, and orchestrated an intricate referral system to capture additional revenue by providing clinical laboratory services through Logan for its pain management practices and surgery centers.

2.     Logan performs urine drug testing ("UDT"), which, when used appropriately, informs physicians of the amount of a particular substance (such as heroin or oxycodone) in a patient's system.  In the last four years, Logan has collected almost 200,000 specimens—approximately 50% of which are from Medicare or Medicaid patients. As a result, Logan has received millions from Medicare and Medicaid for laboratory testing in the last four years.

3.     As detailed herein, Defendants used a variety of schemes to cause physicians to routinely order excessive amounts of UDT for patients (including Medicare and Medicaid patients) regardless of individual patient's need.  Logan's abusive practices included the use of physician standing order forms to encourage routine and excessive UDT, and Logan's standard "32 panel," instead of customizing panels to efficiently and cost-effectively test patients based on their individual needs, as Medicare requires.

4.     These practices were in violation of Medicare laws.  Medicare only covers tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness

or injury, based on his or her medical condition.  42 U.S.C. § 1395y(a)(1)(A).  The need for each

test for each patient must be individually assessed.  42 C.F.R. §§ 410.32(a), (d)(2).

5.      Logan and Surgery Partners were warned by physicians and insurers that its

billing practices and referring schemes were illegal.  Logan nonetheless pressured its employees

into participating in these schemes by fostering a culture of intense sales pressure.

6.      Surgery Partners also paid illegal kickbacks to physicians in the form of financial

bonuses and discounts on services at its surgery centers to induce physicians to make referrals to

Logan.

7.      Since its founding, Logan has knowingly submitted millions of dollars' worth of

false claims to Medicare for drug tests that were not reasonable and necessary and/or were

furnished through prohibited referrals from Surgery Partners' physicians, in violation of federal

law.

8.      As a result of this fraudulent scheme, Logan (and its corporate parent Surgery

Partners) has received millions of dollars from Medicare and Medicaid who paid about 50% of

these unnecessary or illegally induced tests.

## II.    PARTIES

9.      Plaintiff/Relator Brad Ashton ("Ashton") is a citizen of the United States and

resides in the State of Florida.  From 2015 to the present, he has been employed by Surgery

Partners as a Market Account Manager for Logan.

10.     Plaintiff/Relator Jasmine Lopez ("Lopez") is a citizen of the United States and

resides in the State of Florida.  Lopez has worked for Defendants since November 2005.  From

2005 to 2012, she worked as the Area Marketing Manager for Tampa Pain Relief Center

("Tampa Pain") to market multi-specialty practices, such as, Primary Care, Orthopedic, or

Neurology practices, and to generate new patients for Tampa Pain physicians in the Tampa and Orlando markets.  From 2013 to the present, Lopez has been employed by Surgery Partners as a Senior Marketing Manager for Logan to market their toxicology services to pain management physicians.

11.     Plaintiff/Relator Michelle McMahon ("McMahon") is a citizen of the United States and resides in the State of Louisiana.  From June 2015 to the present, McMahon has been employed by Surgery Partners as a Market Account Manager for Logan, servicing accounts owned by Surgery Partners in Louisiana, Georgia, and North Carolina.

12.     Plaintiff/Relator Terry McNamara ("McNamara") is a citizen of the United States and resides in the State of Florida.  From June 2015 to the present, McNamara has been employed by Surgery Partners as a Market Account Manager for Logan.

13.     Defendant Logan Laboratories, LLC is a Delaware limited liability company, headquartered at 5050 W Lemon St., Tampa, FL 33609.  Logan is a wholly-owned subsidiary of Surgery Partners.  Logan describes itself as a "premier full-service toxicology laboratory for the testing of prescription and illicit drugs." Logan offers services such as urine drug screening and confirmation testing to determine the presence or absence of drugs and metabolites. Logan has 38 employees.

14.     Defendant Surgery Partners is a Delaware corporation, headquartered at 40 Burton Hills Boulevard, Suite 500, Nashville, TN 37215.  Surgery Partners describes itself as "a leading operator of surgical facilities across the United States." Surgery Partners' services include physician practices, providing medical supplies to independent eye practitioners, and laboratory services.  According to Surgery Partners' Q2 2016 10-Q, as of June 30, 2016, Surgery Partners owned or operated a portfolio of 103 surgical facilities, comprised of 98 Ambulatory

Surgery Centers, 5 surgical hospitals, and a network of 51 physician practices in 28 states. Surgery Partners owns these facilities in partnership with physicians and, in some cases, healthcare systems.  In 2015, Surgery Partners reported $959.9 million in total annual revenue. Of Surgery Partners' total revenue, the Ancillary Services Group, which includes revenue earned from Logan's services, earned $61.2 million in revenue.  At the time of filing, Surgery Partners had 5,200 employees.

## III.   JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 1345 and 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

16.    This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732, which authorizes nationwide service of process.  Moreover, Defendants can be found, reside in, or have transacted the business that is the subject matter of this lawsuit in this District.

17.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and 31 U.S.C. § 3732(a). Defendants can be found in and have transacted business that is the subject matter of this lawsuit in this District; Defendants prepared and submitted false Medicare, Medicaid, and TRICARE claims in and from this District; Defendants do regular business and have deposited proceeds of the fraud described in this Complaint within the jurisdiction of this Court.  Surgery Partners owns surgery centers in this District, including the Center for Specialized Surgery in Bethlehem, Pennsylvania and the Lebanon Pain Relief Center in Lebanon, Pennsylvania.

18.    This Court has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

## IV.   CONDITIONS PRECEDENT

19.     Pursuant to 31 U.S.C § 3729, *et seq*., this Complaint is to be filed *in camera* and under seal, and is to remain under seal for a period of at least sixty days and shall not be served on Defendants until the Court so orders.

20.     The United States may elect to intervene and prosecute the action within sixty days after it receives both the Complaint and the material evidence submitted with it.

21.     The public disclosure bar of the False Claims Act does not apply to this suit.  This Complaint is not based upon allegations or transactions of fraud that have been publicly disclosed within the meaning of the False Claims Act.  To the extent the applicable statutes of the Plaintiff-States contain public disclosure provisions, those provisions also do not bar this suit.

22.     In the alternative, even if the allegations or transactions of fraud had been publicly disclosed, the Relators are the original sources of the information within the meaning of the False Claims Act.  The information alleged in this Complaint is based upon personal observations, independent of any relevant public disclosure and materially adds to any information that could have been publicly disclosed.

23.     After filing the complaint, Relators will serve a copy of the Complaint upon the United States, together with their written disclosure statements setting forth and enclosing all material evidence and information they possess, under the requirements of 31 U.S.C. § 3730(b)(2).

24.     Relators have complied with all other conditions precedent to bringing this action.

## V.   APPLICABLE LAW

### A.     Medicare Reimbursement for "Reasonable and Necessary" Services

25.     Congress established the Medicare program, or Title XVII of the Social Security Act, in 1965 with the goal of providing nationalized health coverage for Americans aged 65 or

older, and the disabled.  In 2015, Medicare covered over 55 million Americans.  Medicare is funded through the Medicare Trust Fund, which relies on workers' payroll deductions and government funds.

26.     The United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, direct and manage the Medicare program.

27.     Part A of the Medicare Act, 42 U.S.C. § 1395c, *et seq.*, provides insurance for costs of inpatient hospital services and certain other services.  Part A is available without payment of premiums to most persons who paid Medicare payroll taxes prior to becoming Medicare-eligible.  Part A generally pays 100% of the cost of covered services after deductibles and co-insurance, up to Medicare coverage limits.

28.     Part B of the Medicare Act, 42 U.S.C. § 1395j, *et seq.*, is a voluntary program in which the beneficiary pays premiums to Medicare, and in return Medicare pays the costs of his or her medically-necessary outpatient services, such as doctors' office visits and home health care.  Generally, Part B covers 80% of the cost of such services after exhaustion of deductibles.

29.     Section 1862 of the Social Security Act, codified at 42 U.S.C. § 1395y(a)(1)(A), explains that under Medicare Part B, "no payment may be made under part A or part B for any expenses incurred for items or services… [that] are not reasonable and necessary for the prevention of illness."  Medicare does not reimburse for laboratory tests used for screening purposes when the patient does not display symptoms or is not particularly susceptible to the screened-for disease.

30.     Decisions about what services, procedures, or tests are reimbursed, or "covered," by Medicare, is made either locally, or at the national level.  A national coverage determination

is binding on all Medicare Administrative Contractors ("MAC") and Medicare carriers.  In the

absence of a national coverage determination being made, local determinations fill the gap.  The

vast majority of coverage determinations happen at the local level, and are typically made by

fiscal intermediaries, MACs, or durable medical equipment regional carriers.

31.     Medical services, including laboratory tests that have not been established as safe

and effective or have no proven clinical utility are not "reasonable and necessary."  54 Fed.

Reg. 4302-4318.  Health services—including laboratory tests that do not meet this standard—are

considered investigational and are not covered by Medicare.

### B.     Billing Medicare for Testing Services

32.     Laboratory services must meet all applicable requirements of the Clinical

Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

33.     Medicare Part B pays for covered diagnostic laboratory tests that are furnished by

a laboratory.  42 C.F.R. § 410.32(d)(v).  "Clinical laboratory services involve the . . .

examination of materials derived from the human body for the diagnosis, prevention, or

treatment of a disease or assessment of a medical condition."[2]

34.     To receive Medicare reimbursement, "diagnostic laboratory tests, and other

diagnostic tests must be ordered by the physician who is treating the beneficiary," 42 C.F.R. §

410.32(a), and the physician or other Medicare-qualified clinical personnel must certify that the

test is medically necessary and reasonable for the diagnosis and treatment of the patient, 42

U.S.C. § 1395n(a)(2)(B); 42 C.F.R. § 424.10(a).

35.      To comply with the requirements of 42 C.F.R. § 410.32(a), that a treating

physician order and then use the lab results, Medicare requires that laboratories keep and

---

[2] Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1, available at http://www.cms.gov/Regulations-andGuidance/Guidance/Manuals/Downloads/bp102c15.pdf.

maintain documentation from the ordering physician.  This documentation must indicate that the treatment was necessary and reasonable to the patient's particular diagnosis or medical issue, and that the claim submitted to Medicare accurately reflects the information received from the ordering physician.  42 C.F.R. § 410.32(d)(2)(ii).

36.     Medicare typically pays for laboratory testing claims on a fee-for-service basis.  Payment for outpatient lab tests is generally based on the Clinical Laboratory Fee Schedule set out in 42 U.S.C. § 1385l(h)(1)(A).  Laboratories are reimbursed either the lesser of their actual charges, the local fee for that geographic area, or a national limit which is a percent of the median of all local schedule amounts of each test.

37.     When a laboratory provider like Logan performs a test, the provider identifies the Current Procedural Terminology ("CPT") code that correlates to the test being conducted and submits this code to the MAC for reimbursement.

### C.     The Medicaid Program

38.     Medicaid is a public-assistance program that provides payment of medical expenses for low-income and disabled patients.  Federal regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX of the Social Security Act, the Medicaid Act, and with the regulations the Secretary of HHS promulgates.  Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines which restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

39.     Like Medicare, Medicaid covers laboratory testing only if it is reasonable and necessary to diagnose or treat a patient's particular medical condition.  Although Medicaid

reimbursement for laboratory testing varies depending on the state in which the billing is done, all services provided must meet the medical necessity threshold.

### D.    Other Federal and State-Funded Health Care Programs

40.    The federal government administers other health care programs that include but are not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program ("FEHBA").

41.    TRICARE, which the United States Department of Defense administers, is a health care program for individuals and dependents affiliated with the armed forces.  10 U.S.C. § 1071, *et seq.*; 32 C.F.R. § 199.4(a).

42.    CHAMPVA, which the United States Department of Veteran Affairs administers, is a health care program for families of veterans with 100-percent service-connected disabilities. 38 U.S.C. § 1781, *et seq.*; 38 C.F.R. § 17.270(a).

43.    FEHBA, which the United States Office of Personnel Management administers, provides health insurance for federal employees, retirees, and their survivors.  5 U.S.C. § 8901, *et seq.*; 5 C.F.R. § 890.12.

44.    Several states also have programs providing health care benefits to certain individuals based on those individuals' financial need, employment status, and other factors. This Complaint refers to those programs as "state-funded health care programs."

### E.   The Federal False Claims Act

45.    The FCA provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(A)-(B).

46.     The FCA defines the term "claim" to include: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."

47.     The FCA further provides that any person who violates the Act: "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . plus 3 times the amount of damages which the Government sustains because of the act of that person . . ." 31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

### F.  Self-Referral and Anti-Kickback Prohibitions

#### 1.     The Stark Law

48.     The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services," including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception.  42 U.S.C. §§ 1395nn; *see also* 42 C.F.R. §§ 411.351 *et seq*.

49.     Compliance with the Stark Law is a condition of payment by the Medicare program.  Medicare may not pay for any designated health services provided in violation of the Stark Law.  42 U.S.C. §§ 1395nn(a)(1), (g)(1).

50.     The regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ." 42 C.F.R. § 411.353(d).

51.     A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the designated health services.  42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

52.     Effective October 1, 2008, "a physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing designated health services if: (A) The only intervening entity between the physician and the entity furnishing [designated health services] is his or her physician organization; and (B) The physician has an ownership or investment interest in the physician organization." 42 C.F.R. § 411.354(c)(1)(ii).

53.     Under the Stark Law, an "entity is considered to be furnishing [designated health services] if it . . . [is the] entity that has presented a claim to Medicare for the [designated health services] . . . ." 42 C.F.R. § 411.351.

54.     A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [designated health services] for which payment may be made under Medicare Part B . . . ." 42 C.F.R. § 411.351.

55.     The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements.  The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate

the result of tests or procedures for such entity." 42 U.S.C. § 1395nn(h)(1)(C)(ii); 42 C.F.R. § 411.351.

### 2.     The Anti-Kickback Statute

56.     The federal health care Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, arose out of Congressional concern that financial inducements influence health care decisions and result in goods and services being more expensive, medically unnecessary, and harmful to patients.  To protect the integrity of federal health care programs, Congress prohibited the payment of kickbacks in any form, regardless of whether the kickback actually gives rise to overutilization or unnecessary care.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare and Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

57.     The AKS prohibits any person or entity from making or accepting payments to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § l320a-7b(b).  The AKS has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 998 (1985).

58.     The statute prohibits laboratories from offering or paying any remuneration, in cash or kind, directly or indirectly, to induce or influence physicians or others to order or recommend laboratory services that may be paid for by federal health care programs.  42 U.S.C. § 1320a-7b(b).

59.     Compliance with the AKS is a precondition to both participation as a health care provider in and payment under Medicaid, Medicare, TRICARE, CHAMPVA, FEHBA, and other federal health care programs.

60.     For example, to establish eligibility and seek reimbursement from Medicare, providers enter into Provider Agreements with CMS in which the provider must certify the following:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

61.     Similarly, compliance with the AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from government-funded health care programs.

62.     Pursuant to the Affordable Care Act passed in 2010, any claim submitted to a federal health care program that includes items or services resulting from violations of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act.  42 U.S.C. § 1320a-7b(g).

63.     States have also made compliance with the AKS and state anti-kickback statutes and rules a prerequisite to receiving or retaining reimbursement payments from state-funded health care programs.  *See, e.g.,* FLA. STAT. §§ 409.907, 409.920(2)(e); CAL. WELF. & INST. CODE §§ 14107.2(a), (b), 14107.l l-(a)(2); 305 ILL. COMP. STAT. 5/8A-3(b)(2), (c)(2); D.C. CODE § 4802; NEV. REV. STAT.§ 422.560(1)(a); IND. CODE § 12-15-24-2; MONT. ADMIN. R. §§ 37.85.406(10), 37.85.501(h), (k); MONT. CODE ANN. § 45-6-313(l)(b)(i); MINN. R. §§

9505.2165-4(C), 9505.2215-lA; N.J. STAT. ANN.§ 30:4d-17(c); N.J. ADMIN. CODE § 1 0:49-5.5(a)(17); N.M. CODE R. §§ 8.302.1.11, 8.351.2.9-13; N.Y. SOC. SERV. LAW § 366-0(2); N.C. GEN. STAT. §§ 108A-63(g), (h), 108A-70.16, N.C. ADMIN. CODE 22F.0301(5); TENN. CODE ANN. § 71-5-118; TENN. COMP. R. & REGS. §§ 1200-13-l-.05(l)(a)(6), 1200-13-1-.21(2), (3); N.Y. COMP. CODES R. & REGS., tit. 18, §§ 515.2(b)(5), 518.1-2; LA. REV. STAT. ANN. § 46:438.2(2)(A)(2); VA. CODE ANN. §§ 32.1-315; TEX. HUM. RES. CODE ANN. §§ 32.039(b), 32.039(c)(l); OKLA. STAT., tit. 56, § 1005(A)(6); TEX. PENAL CODE ANN. § 35A.02{a)(5); WASH. REV. CODE § 74.09.240; WASH. ADMIN. CODE § 182-502-0016(1); *see also* Florida Medicaid Provider Handbook; Illinois Medicaid Handbook; Minnesota Medicaid Provider Manual; Nevada Medicaid Services Manual; Georgia Medicaid Manual; Louisiana Medicaid Provider Manual; Oklahoma Medicaid Provider Billing and Procedure Manual; Virginia Medicaid Provider Manual.

## VI.  FACTUAL ALLEGATIONS

### A.  Urine Testing and the Clinical Laboratory Business

64.     UDT is a common laboratory test conducted to determine whether a patient is taking drugs that might interfere with planned medical treatment, or to ensure that a patient is compliant with his or her prescription regime.  UDTs are frequently administered in connection with patients undergoing pain management therapy.

65.     UDT is recognized as an appropriate medical treatment and is often reimbursed by public and private insurers.

66.     Not surprisingly, given the vast quantity of UDTs performed, numerous laboratories compete for UDT business generated by hospitals and physicians' offices.

67.     Because much of the cost associated with UDT comes from the capital investment necessary for sophisticated equipment necessary to conduct the tests, the marginal cost of

performing individual tests is relatively low.  Thus, the more UDTs a commercial laboratory performs, the more money it makes.

68.     Clinical urine testing is done in two stages.  First, the doctor's office or the hospital screens for any number of different drugs, typically 11 or 12.  An 11 panel screening test, or "screen," tests for the presence of cocaine, opiates, amphetamines, methamphetamine, phencyclidine (PCP), MDMA (the active ingredient in Ecstasy), barbiturates, benzodiazepines, methadone, tricyclic antidepressants and oxycodone.  A 12 panel screen adds a test for THC, the active ingredient in marijuana.  A screen only determines the presence of the various drugs in the urine.  It cannot measure the concentration.  The second stage—confirmatory testing—does.

69.     There are two methods of performing screens.  The first is an immunoassay, a well-known test that rapidly determines the presence or absence of the tested drugs.  Most hospital laboratories are capable of processing this type of test and results are quickly generated.

70.     The second method is when a drug screen is performed in doctors' offices and clinics (known as "Points of Care" or "POCs") with a relatively inexpensive cup to collect urine. These cups come with an array of strips—typically a panel of 11 or 12 treated strips—one for each drug being tested.  The strips are dipped into the urine specimen by a medical assistant, and a change in color of the strip will illustrate the presence or absence of the specific drug for which each strip tests.  Using POCs, a physician can receive almost immediate results for the substances tested in his own office.

71.     Due to the possibility of false positives and the fact that screens do not provide information about the quantity of drug detected, when a screen returns a positive result, the standard of care is to perform confirmatory testing for the specific drugs that yield a positive result in the screen.

72.     Confirmatory testing is conducted in laboratories, like Logan's, that can perform mass spectrometry and either gas or liquid chromatography.  In contrast to immunoassay analysis or POC screening, confirmatory testing for several drugs must be run separately on each drug and the results will provide the quantity of the drug found in the urine specimen.  False positive or negative results from confirmatory testing are very rare.

73.     Because the equipment required to perform confirmatory urine testing is more sophisticated, many physician practices refer confirmatory drug testing to commercial labs such as Logan.

74.     The two-step process for drug testing is recognized as the most cost efficient method of drug detection.  Costs relating to drug screening are quite low—Medicare reimbursement of a screen with a POC device is $20.47 for an 11 or 12 panel screen and immunoassay testing is comparably reimbursed.

75.     Confirmatory testing of individual drugs is much more expensive.  Medicare reimburses between $21.87 and $48.36 for each of the twelve classes of drug tested, and more when 32 panels are tested.  The full 12 tests on each patient costs over $300.  Logan has charged anywhere between $800 and $4,600 for its confirmatory testing of a 32 panel.

76.     The vast majority of patients do not test positive for any of the drugs; in a healthy population base, only 3 to 5% of all screens return any positive results.  By performing confirmatory testing only on those patients who return a positive screen, and then only testing for the drugs that come back positive, about $20 per patient is spent on drug testing for most patients, and even those that test positive usually incur costs below $75.

77.     To run confirmatory drug tests for all or most patients is medically unnecessary and fiscally irresponsible.

17

### B. Federal Reimbursement for Urine Drug Testing

78.     Medicare, and individual states through Medicaid, reimburse a large percentage of all UDTs conducted in the United States.  Individuals disabled due to chronic pain undergo UDTs on a regular basis, and many of these patients' testing is covered by Medicare.  Logan performs UDTs for Medicare and receives payment for such services directly from the United States.

79.     Logan also performs UDTs for both TRICARE and the Veteran's Administration, and receives payment for such services directly from the United States.

80.     Medicaid, whose population includes beneficiaries with past or present drug abuse, routinely pays for UDTs.  Also, a significant percentage of patients with chronic pain management problems are also Medicaid patients.

81.     Given the large number of UDTs paid for by state and federal governments, federal and state authorities have recognized the potential for abusive billing of the tests and have taken steps to limit the number and types of tests eligible for reimbursement.

82.     The Office of the Inspector General ("OIG") has set guidelines for curbing abusive urine testing.  In August 1998, OIG issued a Compliance Program Guidance for Clinical Laboratories (the "Guidance").  Although the Guidance does not have the force of a duly promulgated regulation, it sets forth OIG's (and Medicare's) understanding of how clinical laboratories should conduct their business in order to avoid running afoul of the Medicare/Medicaid fraud and abuse rules.

83.     The Guidance emphasizes that claims submitted for services will only be paid if the service is covered, and is reasonable and necessary for the beneficiary given his or her clinical condition.  The Guidance warns that Medicare will not pay for testing where

"documentation in the entire patient record ...  does not support that the tests were reasonable and necessary for a given patient."

84.     The Guidance explicitly discourages standing orders, which "too often have led to abusive practices." "Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. . . .  As a result of the potential problems standing orders may cause, the use of standing orders is discouraged." When standing orders are in place, clinical laboratories have a duty to monitor them to ensure that tests are reasonable and necessary.

85.     The Guidance also discusses "custom profiles" used by some laboratories.  These "profiles" are a default set of lab tests to be run each time the physician submits a specimen unless the physician expressly orders a departure from the profile.  When a laboratory permits its physicians to request a custom profile, it must inform the physician: (a) how Medicare reimburses each test requested in the custom profile; (b) that using a custom profile may result in ordering tests that "are not covered, reasonable or necessary and tests that will not be billed;" and (c) that any person who knowingly causes a false claim to be submitted to the government may be subject to sanctions and penalties under civil, criminal and administrative law.  The laboratory must also receive an acknowledgement from the physician that he or she recognizes the implications of using a custom profile.

86.     The Guidance describes several steps clinical laboratories must take to track proper utilization and to halt the performance of unnecessary tests.  If a laboratory discovers that it has in some way contributed to the ordering of unnecessary tests, the Guidance details the laboratory's duty to modify its practices, notify the physician(s) or other authorized individual(s) of its concerns and recommend corrective action.

**C. Surgery Partners illegally and systematically schemed to refer laboratory tests to its subsidiary Logan.**

**1.    Surgery Partners directed its pain management practices to refer all laboratory tests to its subsidiary Logan.**

87.    In 2013, Surgery Partners created Logan and orchestrated an intricate referral system to capture revenue from providing clinical laboratory services for its pain management practices and surgery centers.  Specifically, Surgery Partners directed its pain management practices to test every patient and send those drug screens to Logan for the confirmatory report.

88.    Drug screens are performed at several different locations, including at in-house laboratories of Surgery Partners-owned pain practices and at Surgery Partner's off-site laboratory, Habana, but—consistent with Surgery Partners' directive—all specimens including all Medicare and Medicaid specimens are ultimately sent to Logan for confirmatory testing.  For example, for every patient that provided a specimen at Tampa Pain, one of Surgery Partners' pain management practices, Logan ran the confirmatory report or the initial drug screen.  Director of Operations and Laboratory Administrator of Surgery Partners' Riverside Pain, Kate Gashii, told Surgery Partners Group President of Ancillary Services, Chris Toepke that "every single [specimen] went to Logan… I also spoke to my staff moving forward [that] nothing goes to Quest [Logan's competitor laboratory] without my approval."

89.    On several occasions, Surgery Partners Vice President of Operations, Joe Sholy, and Chris Toepke, directed that Logan receive patients' specimens from internal accounts on "auto-pilot." Through this referral system, Surgery Partners was able to funnel all its pain management practice urine specimens for confirmatory testing at Logan.  Logan thus had no need for external clients.

90.     This intricate referral system is particularly suspect because Logan was modeled after Millennium Laboratories' systems ("Millennium").[3] In April 2014, former Surgery Partners Vice President of Operations & Physicians Services, William Milo, directed Lopez to structure Logan in the same way Millennium was set up.  Milo suggested that Lopez reference Millennium's marketing literature, language from their website, billing policies, and toxicology reporting.  Lopez followed Milo's instructions.

91.     Surgery Partners physicians have recognized the questionable nature of the referral system between Surgery Partners-associated physicians and Surgery Partners' subsidiary Logan.  Dr. Nancy Layton, for example, a pain management specialist, expressed concern about the mutually dependent relationship between Logan and Surgery Partners.  Dr. Layton felt that Surgery Partners forced her to run unnecessary drug screens and send specimens to Logan for confirmatory reports.  Dr. Layton confronted McNamara about whether they had any non-Surgery Partners customers and if so, how many.  Dr. Layton claimed that Surgery Partners was committing fraud and refused to associate her practice with it.  McNamara was subsequently instructed to avoid Dr. Layton's practice until the doctor retired.

92.     In an effort to leave no stone unturned and no specimen untested, in 2015, Surgery Partners hired an entire sales team devoted primarily to ensure Surgery Partners pain management practices would use Logan for this urine drug confirmations testing.

93.     Surgery Partners executives put enormous pressure on the Logan Sales Team, Surgery Partners Regional Sales Team, and physicians to "increase volume" of patients'

---

[3] In October 2015, Millennium settled a False Claims Act lawsuit for $256 million with the Department of Justice to resolve allegations of billing Medicare, Medicaid and other federal health care programs for overutilization of medically unnecessary UTDs and genetic testing and for providing free items to physicians who agreed to refer expensive laboratory testing business to Millennium—conduct nearly identical to what has been occurring at Logan. *See* October 19, 2015 Department of Justice, Office of Public Affairs Press Release, available at https://www.justice.gov/opa/pr/millennium-health-agrees-pay-256-million-resolve-allegations-unnecessary-drug-and-genetic.

specimens for Defendants.  Surgery Partners Regional Manager, Julissa Swim, said she was "persuaded heavily" to get numbers up of confirmations sent in to the laboratory each month. Similarly, Dr. Lindsey Job of Pain Medicine Institute, Brandenton, FL stated that she was told by former Surgery Partners Vice President of Physician Practices Barbara Bowman-Wheatley (who was since replaced by Matthew Richardson) that she was not ordering enough UDTs.  Director of Operations and Laboratory Administrator of Riverside Pain, Katie Gashii, was required to report daily to Surgery Partners Group President of Ancillary Services, Chris Toepke, and other Surgery Partners executives about the volume of specimens being sent to Logan.

94.    By implementing Millennium's billing policies and toxicology reporting system, Surgery Partners placed Logan in a prime position to collect patient specimens from Surgery Partners' physicians, run unreasonable and unnecessary confirmatory reports of their patients' specimens, and then submit false claims for reimbursement from the Medicare, Medicaid, TRICARE and other state-funded health plans, as explained above.

**2.    Surgery Partners provided illegal kickback to physicians in order to increase laboratory tests to Logan.**

95.    In order to entice pain management physicians to hire Logan to run confirmatory tests, Surgery Partners provided illegal kickbacks and bonuses to its physicians who utilized Logan for drug testing or confirmations.

96.    Surgery Partners executives told physicians that they could generate additional income if they send their patients' urine specimens to Logan for testing.  In an effort to convince Dr. Markus John, a pain management physician from Baton Rouge, Louisiana, to join Surgery Partners, William Milo told Dr. John, that there were several ways to supplement their income through Surgery Partners' ancillary programs, including Logan's clinical laboratory services.

22

97.     Upon information and belief, Surgery Partners induced several doctors to refer their specimens to Logan with clandestine payments, incentives, and kickbacks, such as discounts on anesthesia services for using Logan, and preferred surgery times at Surgery Partners' surgery centers.

98.     Defendants, through its executives and employees, knowingly submitted claims to Medicare for UDT that was referred in violation of the Stark Law and Anti-Kickback Statute.

99.     Surgery Partners' efforts vis-à-vis Logan were a resounding success.  Since its inception in 2013 through July 2016, Logan had received almost 200,000 urine confirmation specimens.  An estimated 50% of those urine confirmations were billed to Medicare, Medicaid or TRICARE, for a total of an estimated $200 to $400 million.

**D.  Logan knowingly submitted claims for Medicare and Medicaid reimbursement for laboratory tests that were investigational and medically unreasonable and unnecessary.**

1.     Since Surgery Partners pressured its physician practices to funnel specimens to Logan, Logan was able to further enhance its revenue by systematically submitting claims for reimbursement of laboratory tests that were not based on an individual patient's medical needs, nor authorized by qualified medical personnel. Attached hereto as Exhibit 1 is a Weekly Commentary and Tracking Report issued on August 2, 2016, and a Weekly Commentary and Tracking Report for the Fiscal Year Ended December 31, 2014, which shows the 32 panel confirmation report as the only panel actually run on patients' specimens for almost three years.

100.     Logan ensured that physicians signed Logan authorizations to use a pre-defined "customized" panel for a year from the date of the physician's signature, thereby bypassing decisions of qualified medical personnel.  This gave Logan free reign to run the full 32 panel testing, even when a cheaper smaller panel test would have sufficed.  Logan showed no regard

for Medicare's requirement that such orders should be based on the needs of each individual patient.

101.    Logan created these forms as part of its plan to direct physicians to establish protocols for laboratory testing to be performed on all of their patients—usually, at minimum, 32 or more drug tests—regardless of each patient's individualized need and condition.

102.    Logan even had *physicians* sign a blanket liability waiver, paying no attention to the fact that Logan itself was systematically defrauding Medicare and Medicaid:

> I understand that Medicare and other payors will not cover routine confirmations of drug screens. Testing to confirm a positive drug screen result is reasonable and necessary when the drug screen result is inconsistent with the expected result or with a patient's self-report, clinical presentation, medical history or current prescribed medication plan.  Testing to confirm a negative drug screen result is reasonable and necessary when the result is inconsistent with a patient's self-report, clinical presentation, medical history or current prescribed medication plan, the clinician suspects use of a substance that is inadequately detected or not detected by a drug screen, or to rule out an error as the cause of a negative drug screen result.[4]

103.    In sum, instead of being tailored to individual patients, Logan essentially implemented standing orders to cause physicians to order a large number of unnecessary UDT and confirmatory tests, while knowingly disregarding the Medicare regulations to test based on individual patients' needs.  This "standing order"—while tremendously profitable to Logan—directly contradicts Medicare requirements that lab tests be reimbursed only for conditions relevant to a patient's distinct conditions, not for speculative purposes that may or may not materialize at some point in the future.

---

[4] Logan Physician Authorization Form ¶ 3 (emphasis added).

104.    Although Logan's marketing materials discuss "custom profiles" for physician providers, the reference to "custom profiles" beyond the standard 32 panel was a rarity.  99% of Logan's confirmatory tests were of 32 panels.

105.    32 panel tests were essentially automatic because most Surgery Partner physician practices use an electronic medical records system known as "NextGen." The NextGen system replaces the physicians' independent medical judgment and orders a drug screen coupled with a 32 panel confirmation for all patients, instead of offering customization options.  The NextGen system also does not allow physicians to choose the laboratory from which to order other tests or confirmatory reports.

106.    Logan recently created another profile in the NextGen program for an even larger 44 panel. Undeterred by physician and employee complaints of the excessive testing, Toepke pressured the Logan Sales team to sell the 44 panel.

107.    Defendants' overutilization of the confirmatory panels is so endemic that it includes testing for drugs that have been off the market for more than 5 years.  In July 2016, an Interventional Pain Management Specialist at Tampa Pain, Dr. Miguel D. Attias, questioned the testing for propoxyphene, which has been off the market since November 2010.

108.    Defendants paid particular attention to Medicare patients.  For example, an e-mail from Chris Toepke discussed investments Toepke made in a particular physician's practice in exchange for all of the confirmatory reports of Medicare patients from the 8 physicians in this practice to be referred to Logan

109.    Defendants' routine testing of 32 drugs at a time led to millions of dollars in drug testing for Medicare patients that was not "reasonable and necessary"—including for substances that are rarely abused in the general population, much less in the Medicare population.

110.    Dr. Sheldon Cho of the Florida Pain Institute challenged the high cost and frequency of testing patients at a July 26, 2016 in-person Florida Pain provider meeting attended by Surgery Partners Vice President of Operations, Joe Sholy, and Logan Director, Robert Williams.  Dr. Cho asked why Logan's confirmatory test should be used instead of an inexpensive, in-house POC drug screen cup, which usually cost less than $25.

111.    Dr. Cho also challenged Surgery Partners management and Logan employees about the fact that they run confirmations on all drug screens that come back negative.  Given that testing to confirm a negative drug screen result is reasonable and necessary only when the result is inconsistent with a patient's self-report, clinical presentation, medical history or current prescribed medication plan, Defendants blanket testing of patient's whose drug screens come back negative is in direct contradiction to Medicare laws and regulations.  Despite these challenges, Defendants' misconduct has continued unabated.

112.    Commercial payers, including, Blue Cross Blue Shield of Georgia and Blue Cross Blue Shield of Florida, Aetna, and Cigna, complained to Logan and Surgery Partners' Tampa Pain practice about the overutilization of the 32 panel tests and informed Logan that it was running too many urine drug confirmations.  Logan was informed that if the UDT testing continued at this pace, Logan would risk not being reimbursed by the carrier.

113.    Similarly, United Healthcare ("UHC") got wind of this practice and contacted Tampa Pain about Dr. Robert Guirguis, in particular, because he had ordered the same 32 panel test for every patient.

114.    In response to these challenges from commercial payers, Surgery Partners' physician's assistant Michael Thomas told medical technicians that they should flag insurance patients and only test every six months to avoid overbilling detection.

115.    Even Surgery Partners physicians have come forward to complain about Defendants' excessive drug testing and confirmations.  Dr. Nancy Layton for example, found it "absolutely ridiculous" that Logan tested her 80 year old patient for ecstasy and heroin.  Dr. Layton refused to authorize a drug confirmation test for her patient.  Referencing Logan's testing and billing practices, Dr. Layton told McNamara, "I expect this to be taken care of.  I will not associate my name and practice with fraud."  Dr. Lindsay Job of Venice, Florida also complained that "it's no longer appropriate to test every patient, every visit . . ."  Dr. Man Q. Le of Palm Beach Pain Relief Center complained about the frequency of UDT because he had never ordered so many drug confirmations when he was in private practice.

**E.  Defendants engaged in illegal and questionable billing practices.**

<u>Itemized Billing:</u>

116.    In order to increase bills, Logan itemizes bills (billing for each individual drug tested), instead of bundle-billing (billing once for the 32 panel as a whole).  This allowed Logan to inflate the costs of its services even though the marginal cost of performing individual tests is relatively low.  Defendant Logan's testing costs were thus three times more than other labs.  Medicare, Medicaid, TRICARE and other state-funded health plans funded much of Logan's pure profit testing.

117.    Dr. Lindsay Job complained that "in the last few months, Logan billing has spiraled out of control. [Dr. Job] then handed [Lopez] a folder with exorbitant patient bills . . .[Dr. Job] went straight to practice administration and our billing department to find out why patients were 'triple billed' sent to collections, charged high amounts, etc. . . ."

118.    In one instance, Dr. Cho wrote that Logan had increased their urine screen fee from $2,400 to $4,600 "without reason."

Logan Delayed Billing to Ensure Maximum Reimbursements:

119.    In order to be reimbursed by insurers at the maximum rate, Logan would wait for three months or until a patient's deductible is met before billing a patient.  A patient's deductible is the amount they are required to pay out-of-pocket each year before the insurance provider begins to cover all medical expenses.  Once a patient meets their deductible, their insurer will take over payments for their medical bills.  Since some patients have more trouble meeting their medical expenses, having an insurer cover the patient's bill is preferable. By delaying the mailing patients' bills until a patient met his or her deductible, Logan was able to ensure it would receive the maximum reimbursement from insurers.

120.    Logan Billing Supervisor Julie Davis circulated an internal memo to Practice Managers, copying Joseph Sholy and explained their policy: "Due to most patients having In-Network deductibles to meet in January & February, Logan delays billing patients until the deductible can be re-verified, allowing time for them to meet most, if not all of their deductible prior to sending them a statement for their balance."  Logan's Billing Supervisor later explained, "we have NOT sent her any statements as of yet, we are sitting on the Conf[irmatory] Panel until the deductible comes down below $150."

Balance Billing:

121.    Most Surgery Partners practice patients believe that their specimens will go for testing to a cheaper in-network provider when their physician is in-network.  However, Logan is often out-of-network.  The patient, thus, receives an Explanation of Benefits from his or her insurance reflecting the out-of-network charge, which usually exceeds $2,000.

122.    Logan thus engaged in "balance billing"—*i.e.* billing a patient for the difference between what the patient's health insurance chooses to reimburse and what the provider chooses

to charge.  Balance Billing —is prohibited by several states including Florida, California,

Delaware, Louisiana, New Jersey, New York and Pennsylvania.

123.    Logan's billing methods have resulted in backlash from patients and physicians.

124.    Dr. Thomas Runyan of Consultants in Pain Medicine in Georgia wrote:, "[w]e

have received several calls from patients who have bills from Logan Labs in excess of $800.

They have all expressed concern that they may no longer be able to afford to see you if this is

their cost of the drug testing." Dr. Runyan followed up, "We cannot have patients receiving

EOB's for $2,695.  These are small towns and whether you know it or not, these kinds of

incidences ruin reputations and referral patterns . . . Patients perceive it as price gouging… In my

opinion, your LCMS [chemical analysis] charges should be less than $500."

**F.  To the detriment of patient's health and safety, Logan routinely sent
physicians erroneous lab test results and failed to notify physicians of errors.**

125.    Not only did Defendants fraudulently bill Medicare through illegal referrals,

Logan's lab testing service was also below industry standard.

126.    Several physicians complained about egregiously wrong reports.

- On April 21, 2016, a Sales Representative offered Dr. Kevin Coyle at
Interventional Pain Physician Consultants in Pain Medicine an expanded
44 panel test.  Dr. Coyle responded, "Maybe I should gain confidence in
the current [32] panel before I start expanding the panel to create more
errors."

- On June 22, 2016, Dr. Coyle e-mailed Surgery Partners and Logan
Regional Market Account Manager, Michelle McMahon and recipients: "I
have patients who are taking opiates who have a markedly appropriately
positive opiate result on immunoassay [drug screen results]…When the
sample is run by Logan, I am receiving many reports back that are
completely negative for all tested substances.   AS A RESULT, I
CANNOT TRUST THESE RESULTS."

- In August 2015, Dr. Darin Bush of Oakland Park, Florida did not
prescribe Opana (oxymorphone), which was present in reports for his
patients, while OxyContin (oxycodone), which he did prescribe, was not
present in his patients' reports.

- Dr. Wayne Isaacson's staff at Collier Anesthesia Pain, PA told Logan employees to "please be sure lab personnel are closely reviewing patient medication lists" because Dr. Isaacson was receiving reports that were inconsistent with the medications on his patients' records.

- Dr. Cho reported that most of his patients were reported positive for drugs exceeding normal ranges, and in some cases the results were so far out of range as was represented in Logan's reports, they would be considered critical condition, *i.e.*, needing hospitalization, or comatose. Dr. Cho estimated that the drug ranges were off for at least 50% of his patients. Dr. Cho was concerned that his license was at risk for making treatment decisions based on such extreme results.

127. These concerns were not unfounded. Logan admitted that its physicians had sent out erroneous reports.

128. Physicians often based their treatment decisions on Logan's confirmatory reports. For example, Dr. Kevin Coyle mistakenly discharged two patients based on Logan's reporting error.

129. Logan's Urine Toxicology ("UTOX") disclaimer makes clear that even Logan did not have a lot of faith in the accuracy of its confirmatory report. Logan's UTOX disclaimer, said, "The results are not intended for employment/legal purposes" even though physicians order confirmatory tests from Logan for the very purpose of using the confirmatory tests as legal evidence since the screen test.

130. Logan sent inflated claims for reimbursement from Medicare and Medicaid for these erroneous reports and inaccurate ranges. Furthermore, Logan failed to inform physicians of its testing deficiencies, and thereby put patients' health at risk.

131. Additionally, Surgery Partners' physician practices with in-house laboratories also violated the CLIA, which regulates laboratory testing and requires clinical laboratories to be

certified by their state as well as by CMS before they can accept human samples for diagnostic testing.

132.    Surgery Partners has several pain management practices with in-house laboratories that were not CLIA certified.  Upon information and belief, Surgery Partners Tampa Pain's Habana Laboratory location is not CLIA-certified to collect human specimens for testing, and is nonetheless collecting such specimens for testing.

## VII.  CAUSES OF ACTION

**Count I**
**Federal False Claims Act**
**31 U.S.C. §§ 3729(a)(l)(A), (B), (G)**

133.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1-132 above as though fully set forth herein.

134.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* as amended.

135.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

136.    Defendant Surgery Partners founded Defendant Logan, a toxicology laboratory, to orchestrate an intricate referral system to capture revenue from laboratory services provided to its pain management practices.  Surgery Partners put intense pressure on its practices to send all of their patients' specimens to Logan for confirmatory testing.  Surgery Partners accomplished this goal by requiring that its pain management practices test every single patients that walked through the door, regardless of medical necessity, and then send those specimens for an overly

broad testing of a 32 drug panel so that its subsidiary Defendant Logan could reap pure profit

and bill individually for every single drug tested in the 32 panel.  Based on these medically

unnecessary and unreasonable 32 panels, Logan would claim for reimbursement from Medicare,

Medicaid and other state or government funded health plans in violation of the Federal False

Claims Act.

137.    By and through the acts described above, Defendants knowingly concealed or

improperly avoided or decreased an obligation to pay or transmit money or property to the

Government.

138.    The Government, unaware of the falsity of all such claims made or caused to be

made by Defendants, have paid and continue to pay such false or fraudulent claims that would

not be paid but for Defendants' illegal conduct.

139.    By reason of Defendants' acts, the United States has been damaged, and continues

to be damaged, in a substantial amount to be determined at trial.

140.    Additionally, the United States is entitled to the maximum penalty of up to

$11,000 for each and every violation alleged herein.

### Count II
### California False Claims Act
### Cal. Gov't Code §§ 12651(a)(l)-(2), (7)

141.    This is a claim for treble damages and penalties under the California False Claims

Act, CAL. GOV'T CODE §§ 1265l(a)(l)-(2), (7).

142.    By and through the acts described above, Defendants have knowingly presented

or caused to be presented false or fraudulent claims for payment or approval including those

claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-

Kickback Statute and that were ordered by physicians for uses that were not reasonable and

necessary for the diagnosis or treatment of individual patients to the State of California.

143.    By and through the acts described above, Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State of California.

144.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of California to approve and pay such false and fraudulent claims.

145.    The State of California, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continue to pay the claims that would not be paid but for Defendants' illegal conduct.

146.    Defendants have damaged, and continue to damage, the State of California in a substantial amount to be determined at trial.

147.    Additionally, the State of California is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count III**
**State of Colorado Medicaid False Claims Act**
**Colo. Rev. Stat. §§ 25.5-4-305(1)(a)-(b), (f)**

148.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

149.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

150.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Colorado.

151.    By and through the acts described above, Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State of Colorado.

152.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Colorado to approve and pay such false and fraudulent claims.

153.    The State of Colorado, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

154.    Defendants have damaged, and continues to damage, the State of Colorado in a substantial amount to be determined at trial.

155.    Additionally, the State of Colorado is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count IV**
**Connecticut False Claims Act**
**Conn. Gen. Stat. §§ 17b-301b(a)(l)-(2), (8)**

156.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

157.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

158.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Connecticut.

159.    By and through the acts described above, Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State of Connecticut.

160.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Connecticut to approve and pay such false and fraudulent claims.

161.    The State of Connecticut, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

162.    Defendants have damaged, and continue to damage, the State of Connecticut in a substantial amount to be determined at trial.

163.    Additionally, the State of Connecticut is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count V
## Delaware False Claims and Reporting Act
## 6 Del C. §§ 1201(a)(1)-(2), (7)

164.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

165.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

166.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Delaware.

35

167.    By and through the acts described above, Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the State of Delaware.

168.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Delaware to approve and pay such false and fraudulent claims.

169.    The State of Delaware Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

170.    Defendants have damaged, and continue to damage, the State of Delaware in a substantial amount to be determined at trial.

171.    Additionally, the State of Delaware is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count VI**
**District of Columbia False Claims Act**
**D.C. Code §§ 2-381.02(a}(l)-(2), (6)**

172.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

173.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act, D.C. Co4e § 2-381.02(a)(l)-(2), (6).

174.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

175.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

176.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the District of Columbia.

177.    The District of Columbia Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

178.    By reason of Defendants' acts, the District of Columbia Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

179.    Additionally, the District of Columbia Government is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count VII**
**Florida False Claims Act**
**Fla. Stat. §§ 68.082(2)(a)-(b), and (g)**

180.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

181.    This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081 through 68.092.

182.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

183.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

184.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Florida.

185.    The State of Florida, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

186.    By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

187.    Additionally, the State of Florida is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count VIII
## Georgia State False Medicaid Claims Act
## Ga. Code Ann. §§ 49-4-168.1(1), (2), (7)

188.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

189.    This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

190.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

191.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

192.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Georgia.

193.    The State of Georgia, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

194.    By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

195.    Additionally, the State of Georgia is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count IX**
**Hawaii False Claims Act**
**Haw. Rev. Stat. §§ 661-ll(a)(l)-(2), (6)**

196.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

197.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

198.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Hawaii.

199.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Hawaii.

200.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Hawaii to approve and pay such false and fraudulent claims.

201.    The State of Hawaii, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

202.    Defendants have damaged, and continue to damage, the State of Hawaii in a substantial amount to be determined at trial.

203.    Additionally, the State of Hawaii is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count X**
**Illinois Whistleblower Reward and Protection Act**
**740 Ill. Comp. Stat. §§ 175/3(a)(l)(A)-(B), (G)**

204.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

205.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

206.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Illinois.

207.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Illinois.

208.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Illinois to approve and pay such false and fraudulent claims.

209.    The State of Illinois, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

210.    Defendants have damaged, and continue to damage, the State of Illinois in a substantial amount to be determined at trial.

211.    Additionally, the State of Illinois is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count XI
### Indiana Medicaid False Claims and Whistleblower Protection Act
### Ind. Code §§ 5-11-5.7-2(a)(l)-(2), (6)(B)

212.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

213.    This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act.

214.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

215.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

216.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Indiana.

217.    The State of Indiana, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

218.    By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

219.    Additionally, the State of Indiana is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count XII**
**Iowa False Claims Act**
**Iowa Code §§ 685.l(l)(a)-(b), (g)**

220.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

221.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

222.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Iowa.

223.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Iowa.

224.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Iowa to approve and pay such false and fraudulent claims.

42

225.    The State of Iowa, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

226.    Defendants have damaged, and continue to damage, the State of Iowa in a substantial amount to be determined at trial.

227.    Additionally, the State of Iowa is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XIII**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. §§ 46:438.3(A)-(C)**

228.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

229.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

230.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Louisiana.

231.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Louisiana.

232.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Louisiana to approve and pay such false and fraudulent claims.

233.    The State of Louisiana, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

234.    Defendants have damaged, and continue to damage, the State of Louisiana in a substantial amount to be determined at trial.

235.    Additionally, the State of Louisiana is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XIV**
**Maryland False Claims Act Md.**
**Code Ann., Health-Gen. §§ 2-602(a)(1)(2), (8)**

236.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

237.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

238.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Maryland.

239.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Maryland.

240.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Maryland to approve and pay such false and fraudulent claims.

241.    The State of Maryland, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

242.    Defendants have damaged, and continue to damage, the State of Maryland in a substantial amount to be determined at trial.

243.    Additionally, the State of Maryland is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XV**
**Massachusetts False Claims Law**
**Mass. Gen. Laws ch.12, §§ 5B(a)(1H2), (9)**

244.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

245.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

246.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Massachusetts.

247.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Massachusetts.

248.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Massachusetts to approve and pay such false and fraudulent claims.

249.    The State of Massachusetts, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

250.    Defendants have damaged, and continue to damage, the State of Massachusetts in a substantial amount to be determined at trial.

251.    Additionally, the State of Massachusetts is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count XVI
## Michigan Medicaid False Claims Act
## Mich. Comp. Laws §§ 400.607(2)-(3)

252.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

253.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

254.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Michigan.

255.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Michigan.

256.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Michigan to approve and pay such false and fraudulent claims.

257.    The State of Michigan, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

258.    Defendants have damaged, and continue to damage, the State of Michigan in a substantial amount to be determined at trial.

259.    Additionally, the State of Michigan is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XVII**
**Minnesota False Claims Act**
**2014 Minn. Laws §§ 15C.02(a)(l)-(2), (7)**

260.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

261.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

262.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

263.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, material to false and fraudulent claims.

264.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Minnesota.

265.     The State of Minnesota, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

266.     By Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

267.     Additionally, the State of Minnesota is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count XVIII
## Montana False Claims Act
## Mont. Code Ann.§§ 17-8-403(1)(akb), (g)

268.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

269.     This is a claim for treble damages and penalties under the Montana False Claims Act.

270.     By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Montana.

271.     By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Montana.

272.     Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Montana to approve and pay such false and fraudulent claims.

273.    The State of Montana, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

274.    Defendants have damaged, and continue to damage, the State of Montana in a substantial amount to be determined at trial.

275.    Additionally, the State of Montana is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XIX**
**Nevada False Claims Act**
**Nev. Rev. Stat. Ann. §§ 357.040(1)(a)-(b), (g)**

276.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

277.    This is a claim for treble damages and penalties under the Nevada False Claims Act.

278.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Nevada.

279.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Nevada.

280.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Nevada to approve and pay such false and fraudulent claims.

281.    The State of Nevada, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

282.    Defendants have damaged, and continue to damage, the State of Nevada in a substantial amount to be determined at trial.

283.    Additionally, the State of Nevada is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XX**
**New Jersey False Claims Act**
**N.J. Stat. §§ 2A:32C-3(a)-(b), (g)**

284.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

285.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

286.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Jersey for payment or approval.

287.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of New Jersey.

288.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of New Jersey to approve and pay such false and fraudulent claims.

289.    The State of New Jersey, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

290.    Defendants have damaged, and continue to damage, the State of New Jersey in a substantial amount to be determined at trial.

291.    Additionally, the State of New Jersey is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XXI**
**New Mexico Medicaid False Claims Act**
**N.M. Stat. Ann. §§ 27-14-4(A), (C), & (E)**

292.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

293.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

294.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of New Mexico.

295.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of New Mexico.

296.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of New Mexico to approve and pay such false and fraudulent claims.

297.     The State of New Mexico, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

298.     Defendants have damaged, and continue to damage, the State of New Mexico in a substantial amount to be determined at trial.

299.     Additionally, the State of New Mexico is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XXII
## New York False Claims Act
## N.Y. State Fin. §§ 189(1)(a)-(b), (g)

300.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

301.     This is a claim for treble damages and penalties under the New York False Claims Act.

302.     By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of New York.

303.     By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of New York.

304.     Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of New York to approve and pay such false and fraudulent claims.

305.     The State of New York, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

306.     Defendants have damaged, and continue to damage, the State of New York in a substantial amount to be determined at trial.

307.     Additionally, the State of New York is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

### Count XXIII
### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63 §§ 5053.l(B)(l)-(2), (7)

308.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

309.     This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

310.     By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Oklahoma.

311.     By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Oklahoma.

312.     Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Oklahoma to approve and pay such false and fraudulent claims.

313.     The State of Oklahoma, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

314.     Defendants have damaged, and continue to damage, the State of Oklahoma in a substantial amount to be determined at trial.

315.     Additionally, the State of Oklahoma is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count XXIV**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-607(a)(l)(2), (7)**

316.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

317.     This is a claim for treble damages and penalties under the North Carolina False Claims Act.

318.     By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of North Carolina.

319.     By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of North Carolina.

320.     Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of North Carolina to approve and pay such false and fraudulent claims.

321.     The State of North Carolina, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

322.     Defendants have damaged, and continue to damage, the State of North Carolina in a substantial amount to be determined at trial.

323.     Additionally, the State of North Carolina is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count XXV
### Rhode Island False Claims Act
### R.I. Gen. Laws§§ 9-1.1-3(a)(l)-(2), (7)

324.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

325.     This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

326.     By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Rhode Island.

327.     By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Rhode Island.

328.     Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Rhode Island to approve and pay such false and fraudulent claims.

329.    The State of Rhode Island, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

330.    Defendants have damaged, and continue to damage, the State of Rhode Island in a substantial amount to be determined at trial.

331.    Additionally, the State of Rhode Island is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count: XXVI**
**Tennessee False Claims Act and Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. §§ 4-18-103(a)(l)-(2), (7) and §§ 71-5-182(a)(l)(A)(B), (D)**

332.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

333.    This is a claim for treble damages and penalties under Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

334.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Tennessee.

335.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Tennessee.

336.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Tennessee to approve and pay such false and fraudulent claims.

337.    Relators cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the state presented the false claims. Relators have no control over such entities and no access to records they possess.

338.    The State of Tennessee, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

339.    Defendants have damaged, and continue to damage, the State of Tennessee in a substantial amount to be determined at trial.

340.    Additionally, the State of Tennessee is entitled to the maximum penalties pursuant to the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act for each and every violation alleged herein.

## Count XXVII
### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. §§ 36.002(1), (2), (4), (7), and (12)

341.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

342.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001, *et seq*.

343.    By and through the acts described above, Defendants have knowingly made or caused to be made false statements or misrepresentations of material facts to permit it to receive payments from the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized.

344.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-

Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

345. By and through the acts described above, Defendants have knowingly concealed or failed to disclose information, thus permitting it to receive payments from the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized.

346. By and through the acts described above, Defendants have knowingly made or caused to be made false statements or misrepresentations of material facts regarding information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

347. By and through the acts described above, Defendants have knowingly made or caused to be made claims under the Medicaid program for services and/or products not approved or acquiesced to by a treating physician.

348. By and through the acts described above, Defendants have knowingly and improperly avoided an obligation to pay or transmit money to the State of Texas under the Medicaid program.

349. The State of Texas, unaware of the falsity of all such claims and statements material to payments made, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

350. By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

351. Additionally, the State of Texas is entitled to the maximum penalty of up to $10,000 for each and every violation alleged herein, and up to $15,000 per violation if the violation results in harm to an elderly person.

## Count XXVIII
## Vermont False Claims Act
## Vt. Stat. Ann. Tit. 32, §§ 631(a)(l)-(2), (10) (2015)

352.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

353.     This is a claim for treble damages and penalties under the Vermont False Claims Act.

354.     By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Vermont.

355.     Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Vermont to approve and pay such false and fraudulent claims.

356.     The State of Vermont, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

357.     Defendants have damaged, and continue to damage, the State of Vermont in a substantial amount to be determined at trial.

358.     Additionally, the State of Vermont is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## Count XXIX
## Virginia Fraud Against Taxpayers Act
## Code Ann. §§ 8.0l-216.3(A)(l)-(2), and (7)

359.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

360.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

361.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

362.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Virginia.

363.    The State of Virginia, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be made, used, or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

364.    By reason of Defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

365.    Additionally, the State of Virginia is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

### Count: XXX
### Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code §§ 74.66.020(1)(a)-(b), (g)

366.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 132 above as though fully set forth herein.

367.    This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act.

368.    By and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients to the State of Washington.

369.    By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Washington.

370.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Washington to approve and pay such false and fraudulent claims.

371.    The State of Washington, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

372.    Defendants have damaged, and continue to damage, the State of Washington in a substantial amount to be determined at trial.

373.    Additionally, the State of Washington is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. §§ 3729, *et seq*.;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions,

plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.      That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(a) of the Federal False Claims Act;

4.      That Defendants cease and desist from violating the District of Columbia False Claims Act, D.C. CODE §§ 2-381.02(a)-(d); California False Claims Act, CAL. GOV'T CODE §§ 1265l(a)(l)-(2); Colorado Medicaid False Claims Act, COLO. REV. STAT. §§ 25.5-4-305(1)(a)(b); Connecticut False Claims Act, CONN. GEN. STAT. §§ 17b-301b(a)(l)-(2); Delaware False Claims and Reporting Act, 6 DEL. C. §§ 120l(a)(l)-(2); Florida False Claims Act, FLA. STAT. §§ 68.082(2)(a)-(b), and (g); Georgia State False Medicaid Claims Act, GA. CODE ANN.§ 494-168 to 49-4-168.6; Hawaii False Claims Act, HAW. REV. STAT. §§ 661-2l(a)(l)-(2); Illinois Whistleblower Reward and Protection Act, 740 ILL. COMP. STAT. §§ 175/3(a)(l)(A)-(B); Indiana Medicaid False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5.7 *et seq*. (as amended through P.L. 109-2014); Iowa False Claims Act, IOWA CODE §§ 685.2(1)(a)(b); Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. §§ 46:438.3(A)(B); Maryland False Health Claims Act, MD. CODE ANN., HEALTH-GEN. §§ 2-602(a)(l)-(2); Massachusetts False Claims Law, MASS. GEN. LAWS CH. 12 §§ SB(a)(l)-(2); Michigan Medicaid False Claims Act, MICH. COMP. LAWS §§ 00.601 *et seq*.; Minnesota False Claims Act, 2014 MINN. LAWS §§ 15C.01-15C.16; Montana False Claims Act, MONT. CODE ANN. §§ 17-8-403(l)(a)-(b); Nevada False Claims Act, NEV. REV. STAT. ANN. §§ 357.040(1)(a)-(b); New Jersey False Claims Act, N.J. STAT. §§ 2A:32C-3(a)-(b); New Mexico Medicaid False Claims Act, N.M. STAT. ANN. §§ 27-14-4(A) & (C); New York False Claims Act, N.Y. STATE FIN. §§ 189(l)(a)-(b); Oklahoma Medicaid False Claims Act, OKLA. STAT. TIT. 63 §§ 5053.l(B)(l)-(2);

North Carolina Medicaid False Claims Statute, N.C. GEN. STAT. §§ 1607(a)(l)-(2); Rhode Island False Claims Act, R.I. GEN. LAWS §§ 9-1.1-3(a)(l)-(2); Tennessee False Claims Act and Tennessee Medicaid False Claims Act, TENN. CODE ANN. §§ 4-18-103(a)(l)-(2) and §§ 71-5-182(a)(l)(A)-(B); Texas Medicaid Fraud Prevention Act, HUM. RES. CODE ANN. §§ 36.002(1), (2), (4), (7), and (12); Vermont False Claims Act, VT. STAT. ANN. TIT. 8, §§ 630 *et seq.*; Virginia Fraud Against Taxpayers Act, VA. CODE ANN. §§ 8.01-216.3(A)(l)-(2), and (7); and Washington State Medicaid Fraud False Claims Act, WASH. REV. CODE §§ 74.66.020(l)(a)-(b).

5.   That this Court enter judgment against Defendants for damages and penalties under the District of Columbia False Claims Act, D.C. CODE §§ 2-381.02(a)-(d); California False Claims Act, CAL. GOV'T CODE §§ 1265l(a)(l)-(2); Colorado Medicaid False Claims Act, COLO. REV. STAt. §§ 25.5-4-305(l)(a)-(b); Connecticut False Claims Act, CONN. GEN. STAT. §§ 17b-301b(a)(l)-(2); Delaware False Claims and Reporting Act, 6 Del. C. §§ 120l(a)(l)-(2); Florida False Claims Act, FLA. STAT. §§ 68.082(2)(a)-(b), and (g); Georgia State False Medicaid Claims Act, GA. CODE ANN.§ 49-4-168 to 49-4-168.6; Hawaii False Claims Act, HAW. REV. STAT. §§ 661-21(a)(l)-(2); Illinois Whistleblower Reward and Protection Act, 740 ILL. COMP. STAT. §§ 175/3(a)(l)(A)-(B); Indiana Medicaid False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5.7 *et seq.* (as amended through P.L. 109-2014); Iowa False Claims Act, IOWA CODE §§ 685.2(l)(a)-(b); Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. §§ 46:438.3(A)-(B); Maryland False Health Claims Act, MD. CODE ANN., Health-Gen. §§ 2-602(a)(l)-(2); Massachusetts False Claims Law, MASS. GEN. LAWS CH. 12 §§ SB(a)(l)-(2); Michigan Medicaid False Claims Act, MICH. COMP. LAWS §§ 400.601 *et seq.*; Minnesota False Claims Act, 2014 MINN. LAWS §§ 15C.Ol-15C.16; Montana False Claims Act, MONT. CODE ANN. §§ 17-8-403(l)(a)-(b); Nevada False Claims Act, NEV. REV. STAT. ANN.§§ 357.040(l)(a)-

(b); New Jersey False Claims Act, N.J. STAT. §§ 2A:32C-3(a)-(b); New Mexico Medicaid False

Claims Act, N.M. STAT. ANN.§§ 27-14-4(A) & (C); New York False Claims Act, N.Y. STATE

FIN. §§ 189(l)(a)(b); Oklahoma Medicaid False Claims Act, OKLA. STAT. TIT. 63

§§ 5053.l(B)(l)-(2); North Carolina Medicaid False Claims Statute, N.C. GEN. STAT. §§

1-607(a)(l)-(2); Rhode Island Claims Act, R.I. GEN. LAWS §§ 9-1.1-3(a)(l)-(2); Tennessee False

Claims Act and Tennessee Medicaid False Claims Act, TENN. CODE ANN. §§ 4-18-I03(a)(l)-(2)

and §§ 71-5182(a)(l)(A)-(B); Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN.

§§ 36.002(1), (2), (4), (7), and (12); Vermont False Claims Act, VT. STAT. ANN. TIT. 8, §§ 630 *et*

*seq.*; Virginia Fraud Against Taxpayers Act, VA. CODE ANN. §§ 8.01-216.3(A)(l)(2), and (7);

and Washington State Medicaid Fraud False Claims Act, WASH. REV. CODE §§ 74.66.020(l)(a)-

(b).

      6.     That Relators be awarded all costs of this action, including attorneys' fees and

expenses; and

      7.     That the United States and Plaintiffs-Relators recover such other and further relief

as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: August 22, 2016

Respectfully submitted,

**LOWEY DANNENBERG COHEN & HART, P.C.**

/s/ Peter D. St. Phillip_____
Peter D. St. Phillip
Uriel Rabinovitz
Melissa Cabrera
Samantha Breitner
One North Broadway, Suite 509
White Plains, NY 10601
Tel.:    (914) 997-0500
Fax:    (914) 997-0035
pstphillip@lowey.com
urabinovitz@lowey.com
mcabrera@lowey.com
sbreitner@lowey.com


/s/ Greg Murphy_____
Greg Murphy
3045 Fritchie Drive
Baton Rouge, La. 70809
Tel.:    (225) 266-7172
Fax:    (225) 767-8995
E-mail: greg@mandmlawfirm.com


*Attorneys for Plaintiffs/Relators Brad Ashton, Jasmine Lopez, Michelle McMahon and Terry McNamara*